**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**May 11, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

U.S. CELLULAR CORPORATION,

      Plaintiff,

BILL JOHNSON,

      Plaintiff-Intervenor-
      Appellant,

v.

BOARD OF ADJUSTMENT OF THE
CITY OF SEMINOLE, OKLAHOMA,

      Defendant-Appellee.

No. 02-7124
(D.C. No. 02-CV-185-P)
(E.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **O'BRIEN** and **BALDOCK**, Circuit Judges, and **BRORBY**, Senior Circuit
Judge.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously to grant the parties' request for a decision on the briefs without oral
argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore
ordered submitted without oral argument. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and
collateral estoppel. The court generally disfavors the citation of orders and
judgments; nevertheless, an order and judgment may be cited under the terms and
conditions of 10th Cir. R. 36.3.

Plaintiff-intervenor Bill Johnson appeals from an order denying his request for a mandatory injunction under the Telecommunications Act of 1996 (TCA), 47 U.S.C. § 332(c)(7)(B).[1]  Specifically, Mr. Johnson claims the Board of

---

[1]    47 U.S.C. § 332(c)(7) provides in relevant part:

(A) General authority

Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

(B) Limitations

(i) The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof--

  (I) shall not unreasonably discriminate among providers of functionally equivalent services;  and

  (II) shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

(ii) A State or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request.

(iii) Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

(continued...)

Adjustment of the City of Seminole, Oklahoma (the Board) violated the TCA when it denied a request for a zoning variance to construct and locate a cellular transmission tower on his property.[2]  As initially proposed, the tower was to be used by U.S. Cellular Corporation (USCC) to provide wireless communication services, *see* Aplt. App. at 9, and "[a]t the top of the [tower] there [was going to] be a triangular platform" on which would be placed several antennas, *id.*  Mr. Johnson and USCC jointly requested the variance because the proposed location

---

[1](...continued)

**(iv)** No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

**(v)** Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction.  The court shall hear and decide such action on an expedited basis.  Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commission for relief.

[2]    USCC obtained an option to lease part of Mr. Johnson's property where it proposed to erect its cellular tower.  For that reason it prepared an application for a setback variance listing it and Mr. Johnson as joint applicants. USCC decided not to exercise its option and withdrew from the process.  Mr. Johnson also requested a writ of mandamus and a declaratory judgment from the district court. Those requests are not relevant to the issues raised in this appeal, and we therefore do not need to address them.

for the tower did not meet the City's setback requirements.[3]

After the Board denied the variance request for Mr. Johnson's property, USCC entered into a lease agreement with the City of Seminole, *see* Ex. B to USCC's Motion to Dismiss Appeal, and USCC subsequently placed its antennas on a water tower owned by the City, *id.*, Ex. A at 2-3. Thus, while USCC was initially a plaintiff in the district court action, it is not a party to this appeal. USCC has also specifically informed this court that "it will not take any further action to gain the permits and approvals necessary to place a tower on [Mr. Johnson's] property." *Id.* at 3. Nonetheless, Mr. Johnson is still seeking a variance for the proposed tower, and he has suffered an injury for purposes of establishing Article III standing, and his application for a variance is not moot.

As set forth herein, we conclude that the Board did not violate the TCA's procedural requirements when it denied Mr. Johnson's request for a variance from the City's setback requirements. We therefore affirm the district court's denial of injunctive relief under the TCA.

**A. Telecommunications Act of 1996.**

According to the TCA, "[a]ny decision of a State or local government . . .

___

[3] The city's zoning ordinance "requires a setback of 120% of the tower height from all property lines. Further, said Section requires all towers to be setback their height distance from any structure that is being occupied." Aplt. App. at 227.

to deny a request to . . . construct . . . personal wireless facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). With regard to the "in writing" requirement, we agree with the following reasoning of the Sixth Circuit:

> We hold that for a decision by a State or local government . . . denying a request to place, construct, or modify personal wireless service facilities to be "in writing" for the purposes of . . . § 332(c)(7)(B)(iii), it must (1) be separate from the written record; (2) describe the reasons for the denial; and (3) contain a sufficient explanation of the reasons for the denial to allow a reviewing court to evaluate the evidence in the record that supports those reasons.

*New Par v. City of Saginaw*, 301 F.3d 390, 395-96 (6th Cir. 2002); *see also United States Cellular Telephone of Greater Tulsa, L.L.C. v. City of Broken Arrow, Oklahoma*, 340 F.3d 1122, 1135 (10th Cir. 2003) (noting that the purpose of the TCA's "'writing' requirement is to facilitate meaningful judicial review"). Consequently, "we do not require formal findings of fact or conclusions of law . . . . Nor need a board's written decision state every fact in the record that supports its decision." *National Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 20-21 (1st Cir. 2002).

With regard to the "substantial evidence" requirement, we also agree with the Sixth Circuit that "the 'substantial evidence' standard of section 332 is the traditional standard employed by the courts for review of agency action." *New Par*, 301 F.3d at 396 (quotation omitted); *accord Cellular Tel. Co. v. Town of*

*Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999); *National Tower, LLC*, 297 F.3d at 21. Thus, "[s]ubstantial evidence, in [this] context, has been construed to mean less than a preponderance, but more than a scintilla of evidence. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Town of Oyster Bay*, 166 F.3d at 494. As we have recognized, however, the TCA's requirement that local zoning decisions be supported by substantial evidence "does not affect or encroach upon the substantive standards to be applied under established principles of state and local law." *City of Broken Arrow,* 340 F.3d at 1133 (quotation omitted). As a result, when considering a request to construct a wireless service facility, local zoning authorities may consider factors such as aesthetics and public safety. Their discretion is not unfettered, however, and "[m]ere generalized concerns . . . are insufficient to create substantial evidence . . . ." *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1219 (11th Cir. 2002); *see also Southwestern Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 57 (1st Cir. 2001) ("[T]he TCA . . . provides protections from irrational or substanceless decisions by local authorities.").

Following the lead of the First Circuit, "[w]e [also] make explicit another aspect of judicial review of local [zoning] decisions [under the TCA]," and that is that "[a] board may not provide the applicant with one reason for a denial and then, in court, seek to uphold its decision on different grounds." *National Tower,*

*LLC*, 297 F.3d at 21; *accord Preferred Sites, LLC*, 296 F.3d at 1220 n.9 (stating that a zoning board "may not rely on rationalizations constructed after the fact to support the denial of [an] application"). In other words, "[p]ost-hoc rationales cannot serve as substantial evidence." *USOC of Greater Iowa, Inc. v. City of Bellevue, Nebraska*, 279 F. Supp. 2d 1080, 1087 (D. Neb. 2003).

Finally, as a means to enforce the written decision and substantial evidence requirements, the TCA provides a private cause of action for "[a]ny person adversely affected by any final action . . . by a State or local government . . . that is inconsistent with [§ 332(c)(7)(B)(iii)]." 47 U.S.C. § 332(c)(7)(B)(v). Although the TCA does not provide a statutory remedy for a violation of its provisions, it is well established that "injunctive relief is an appropriate remedy for violations of [the TCA's procedural requirements]." *New Par*, 301 F.3d at 399. The decision of whether to grant equitable relief under the TCA is a matter left to the discretion of the district court. *See Preferred Sites, LLC*, 296 F.3d at 1220-22.

**B. Proceedings Before the Board and the District Court.**

While Mr. Johnson and USCC were nominally joint applicants for the variance, USCC presented the case before the Board, which met to vote on the requested zoning variance on March 14, 2002. At that time, USCC had revised its plans regarding the proposed tower, and, instead of a 140 foot monopole tower, it

was requesting a variance to construct a shorter 120 foot sectional tower. As reflected in the minutes of the Board's meeting on March 14, 2002, however, the Board addressed both the newly-proposed 120 foot sectional tower and the original 140 foot monopole tower, and the board denied the requested variances as to both towers. *See* Aplt. App. at 23-24.

The minutes of the Board's March 14, 2002 meeting were authored by Buster Wilcox, the City of Seminole's Director of Community Services, and the minutes give the following explanation for why the variances were denied:

> Request from property owner for a variance of 30' on east property line and 20' on west property line as required by City Ordinance #877 . . . . A shorter (120') sectional tower still does not meet setbacks as required by ordinance. The sectional tower could fall to the center of Eureka Street and across the alley to the west. Also, the tower could fall over 50' of Bill's Garage. The locations are just not big enough to construct a 120' sectional tower, nor a 140' monopole tower. . . . Variance denied.

> Property owner requested a vote on the 140' monopole tower since it was continued instead of withdrawn. . . . Variance denied.

*Id.* The Board did not issue a separate written decision denying the variances. In addition, although a formal "Board of Adjustment Record" was subsequently compiled by counsel for the Board in June 2002, *id.* at 3, it does not appear that a formal written record had been compiled prior to that time.

On April 8, 2002, USCC filed its complaint in the district court, claiming that the "Board violated the requirement of the Telecommunications Act that there

be a written denial supported by substantial evidence contained in the written record." R., Doc. 1 at 3. USCC's complaint addressed only the proposed 140 foot monopole tower, and it did not mention the proposed 120 foot sectional tower. In order to remedy the alleged violation of the TCA, USCC requested "a mandatory injunction . . . directing [the] Board to approve USCC's application for a . . . variance to locate a 140 foot monopole cellular transmission tower . . . on [Johnson's] Property in accordance with the site plan submitted by USCC." *Id.* at 4.

On May 16, 2002, Mr. Johnson filed a motion to intervene as an additional party plaintiff in the district court action, claiming that USCC was no longer protecting his interests since it had recently negotiated the water tower lease with the City of Seminole. Like USCC's complaint, Mr. Johnson's motion to intervene addressed only the proposed 140 foot monopole tower. In addition, Mr. Johnson informed the district court that "the causes of action asserted by Intervenor[] are identical to the causes of action asserted by USCC in [its] complaint against the City." R., Doc. 5 at 4. On June 4, 2002, the district court granted Mr. Johnson's motion to intervene. [4]

---

[4] In its complaint, in addition to the claim under the Telecommunications Act, USCC also asserted the following claims against the Board: (1) federal and state due process and equal protection claims; and (2) a state-law claim for violating the City of Seminole's zoning regulations. In this appeal, Mr. Johnson

(continued...)

Subsequently, on August 2, 2002, the district court entered a minute order stating the following:

> The Court finds that the Board violated the Telecommunications Act of 1996, by failing to set forth written findings of fact, based on substantial evidence contained in a written record, supporting its decision.
>
> The Board shall have twenty (20) days, or until August 22, 2002, to provide such a written decision . . . . after which the Court will perform an expedited review, as contemplated by the Act, of the merits.

R., Doc. 31. In response to this order, the Board prepared a formal written decision, and the decision was submitted to the district court on August 22, 2002.

In its written decision, the Board denied the requested variance for the proposed tower based on its finding that "the variance cannot be granted without undermining the public safety . . . ." Aplt. App. at 230. With regard to the issue of public safety, the Board elaborated on its reasoning as follows:

> The Board of Adjustment further finds that the subject tract of land is far too small to construct a tower 140' in height. . . . Even using the entire Johnson tract as the subject tract, [USCC] would require a variance of 118', which is equivalent to 85% of the tower's height. Applicant presented evidence regarding the stability and strength of the proposed monopole tower and the unlikelihood of it falling. The Board is not overly impressed with this evidence. [USCC] presented letters written by a contract administrator of the tower manufacturer and presented photographs of towers that had

---

[4](...continued)
has abandoned these other claims. As a result, this appeal involves only Mr. Johnson's claim under the Telecommunications Act.

been constructed in other cities without setback restrictions. The Board remains unconvinced that the failure of the tower is an impossible occurrence. However, we find in the information provided that the setback area, or what might better be referred to as a "safety area," is not so much to protect the public from towers failing, but to protect the public from ice which may form on and fall from the tower. This concern was raised several times during the discussions over this Application, but no solution was ever reached or suggested. It still appears that a setback or safe zone may be the best means to protect the public when a site abuts a residentially zoned property or when the site abuts a street or alleyway. . . . The[] facts suggest that members of the public would be in close proximity to the tower on a regular basis. Even if the tower is impervious to collapse, a fact the Board is unwilling to concede, the concern over ice falling off the tower remains a significant, yet unanswered concern. We do not, therefore, consider the variance to be in the best interest of the public.

> . . . .

> . . . In this case it is the issue of public safety . . . that most concerns the Board. While [USCC] has addressed the issue of the tower falling to some degree, it has failed to adequately satisfy the Board. It has failed to address the Board's concern over ice forming on the tower and then falling on pedestrians, buildings, and passing vehicles at all.

*Id.* at 230-32.

On September 18, 2002, the district court entered an order denying Mr. Johnson's request for injunctive relief under the TCA, finding that "[b]ased on the written findings submitted by the Board, . . . the Board has supported its decision by substantial evidence in compliance with the Act." R., Doc. 39 at 4.

**C. Analysis.**

-11-

### 1. Standing and Mootness.

Despite the fact that USCC no longer has any plans to build a tower on Mr. Johnson's property, Mr. Johnson has suffered an injury for purposes of establishing Article III standing, and his application for a variance is not moot. To begin with, after the Board denied the requested variance, USCC decided not to exercise its option to lease a portion of Mr. Johnson's property for construction of the proposed tower. *See* USCC's Motion to Dismiss Appeal, Ex. A at 2-3. Even though USCC only had an option to lease Mr. Johnson's property for the installation of its antennas, Mr. Johnson therefore lost a potential future income stream, and there is no question that his loss is traceable to the actions of the Board.

Mr. Johnson, who was a co-applicant for the variance, has suffered a continuing injury that this court could presently redress by granting the requested injunctive relief under the TCA. Most importantly, although the potential worth of the variance is obviously much more speculative now that USCC is out of the picture, the variance is still an asset with potential future value, and the Board has failed to demonstrate either: (1) that USCC's withdrawal from the project raises a legal impediment to the Board now granting the variance to Mr. Johnson as the sole applicant; or (2) that there are any provisions of local or state law which would prevent Mr. Johnson from constructing a tower on his property if the

-12-

variance was granted. Consequently, despite the changed circumstances pertaining to USCC, this appeal still presents a live case or controversy for purposes of Article III.

**2. Merits.**

We conclude that there is substantial evidence in the record to support the Board's denial of the requested variance from the City's setback requirements, and we reject Mr. Johnson's claim that the Board applied an *ad hoc* rationale to deny the variance. Applying our own Tenth Circuit precedent, we emphasize that the burden fell squarely on USCC and Mr. Johnson with respect to meeting certain ordinance requirements, including showing why co-location was not an option or establishing an undue hardship existed with respect to the specific site selected. We also reject any inference that the Board was responsible for providing expert evidence to support its denial.

To begin, the variance application and its attached documents indicated the tower would be placed on a 50-foot by 50-foot site owned by Mr. Johnson, but they did not explain why co-location through use of existing towers would not meet service needs, even though the ordinance at issue specifically states "[t]he application should look at co-location on an existing tower, and if not feasible, indicate why it is not feasible." Aplt. App. at 179(n); *id.* at 4, 8, 11, 177. These documents also did not disclose why denial of a variance for the Johnson site

-13-

would create an unnecessary hardship, as required by the local zoning code, which states variances are granted in individual cases only where "unnecessary hardship" will result, and "[r]elief, if granted, would not cause substantial detriment to the public good or impair the purposes and intent of the zoning regulations."  *Id.* at 181-83 and § 12-125 (¶¶ A-D, F).

It is clear the Board and its staff considered these and several other factors in advance of denying the variance.  Early in the application process, on November 26, 2001, an attorney for USCC sent the Seminole City Planner and Director of Community Services, Buster Wilcox, a letter on placement of the monopole tower on the Johnson site.  *Id.* at 156-57.  He generally stated: 1) a tower was necessary on the Johnson site because the site was .5 miles northwest of the search ring identified by USCC engineers and below the needed elevation; 2) the city water tower did not meet the wind speed and ice specifications defined in the ordinance; and 3) the possibility of co-location on an existing cellular tower would not meet its need for providing coverage of all the highways in and around Seminole.  *Id.*  He did not explain or discuss in detail why these or other co-location towers or alternative property sites were not feasible to service those areas, but attached an affidavit of an Associate Radio Frequency Engineer which simply stated, "the proposed tower is necessary to provide cellular service in an area where there is inadequate service."  *Id.* at 159.  Later, in a December 10,

2001 letter, a representative of USCC sent the City a letter explaining why the selected location met the topographical and geographical factors needed, but it again failed to discuss why co-location or alternative locations were not available. *Id.* at 151-55. Finally, on January 29, 2002, the manufacturer of the proposed monopole tower sent a letter generally stating it did not expect the monopole to fail, it had no record of failure or collapse, that catastrophic wind conditions such as those experienced in a tornado may result in damage or distortion of the monopole tower, and that in the unlikely event of failure it would mostly likely bend or buckle, collapsing at the section points. *Id.* at 74.

Armed with this information, staff recommended against a variance at the Board meeting on January 31, 2002, giving as reasons: 1) the purpose of setback is for safety reasons; 2) the 140-foot tower would be within 40 to 50 feet of the west property line, so if it fell over, 100 feet of it could fall on other structures or citizens; and 3) the manufacturer gave unconvincing assurances the tower would not fall over. *Id.* at 19-20. Staff also suggested other alternative locations existed, which USCC "found not satisfactory for location of a tower by [USCC] engineers." *Id.* at 20. Ultimately, the Board agreed to table a vote for further consideration, noting the City of Seminole is pro business and volunteering to compare its setback ordinance with other cities and "get another engineering opinion to determine if our ordinance is excessive." *Id.*

-15-

On February 14, 2002, prior to the next Board meeting on the matter, Director Buster Wilcox sent a letter to the Board and USCC in a clear attempt to address: 1) the safety and other concerns raised by the variance request; 2) USCC's claim unsatisfactory alternatives existed; and 3) the Board's decision to compare its setback ordinance with other cities and get an opinion on whether its setback requirement was excessive. *Id.* at 25-27. The letter began with Director Wilcox identifying the five conditions required to be satisfied by local governments under the Telecommunications Act in decisions concerning the siting of towers and how the City satisfied, or intended to satisfy, those five conditions or requirements. *Id.* at 25-26. With respect to the Act's requirement that denials must be "in writing and supported by substantial evidence contained in a written record," the letter stated it intended to meet such requirement in the event of denial by providing USCC with: 1) a copy of the minutes of the Board meeting of such denial; and 2) a copy of "this recommendation." *Id.* at 26. Neither USCC nor Mr. Johnson objected to this means of meeting the "in writing" requirement for its denial.

Next, Director Wilcox's February 14, 2002 letter recommended denial of the variance. This letter sets forth many of the reasons for denial of the requested variance that were considered by the Board before its final vote. Director Wilcox listed the following reasons for denying a variance, *id.* at 26-27:

1) the variance would discriminate against another cellular company which wanted to put a monopole tower in town and, when informed of the setback requirements, placed its tower on land complying with such requirements;

2) the setback of 110% of the height of the tower was reasonable when compared with the attached Oklahoma Municipal League (OML) recommendation of the same 110% height setback requirement, and the City of Tulsa's existing ordinance which also set out a 110% height setback requirement;

3) when asked to comment on the setback ordinance, Doug McCleary of Myers Engineering "stated basically the same info we received from OML[5] and another statement that 'anything can fall'";

4) a tower could cause the City of Seminole to lose needed housing units given the north side of the property was zoned for two-family dwellings and at one time a developer was going to build duplexes on a vacant lot in that area;

5) the engineer's plans were not fully stamped;

6) the manufacturer's letter contained statements too vague and non-committal, including, for example, that "wind conditions . . . experienced in a

---

[5]    As discussed later, the OML information and sample ordinance referred to in and attached to the letter recommended, for safety reasons, "fall zones range from a set back distance equal to 110% of the height of the tower to 50% of the height," or equal to its height if, like here, it abutted a residentially zoned property or a street, and it identified as a safety issue the risk of falling debris from towers, including ice.  Aplt. App. at 46, 67.

tornado . . . **may** result in damage," which arguably is a legitimate concern in Oklahoma. The letter also mentioned it was unlikely a vehicle would hit a two-story structure, "but one did," and that the strongest statement of no record of failure or collapse of a monopole tower was also vague because of the relatively short life of most cell towers;

7) many cities have declared a moratorium on construction of such towers "until the problems are resolved," but instead of a moratorium and because Seminole is pro business, he would simply encourage following the ordinance;

8) Seminole encourages co-location of antennas on existing structures, and alternatives were available, including placement on water towers, other buildings, telephone poles, and existing radio antennas, and the Director had "heard nothing about U.S. Cellular collocating on the Cellular One tower";

9) to meet the City's ordinance for a 140-foot monopole, the tower would need a little over two acres of land, and several alternative locations existed "around town" where a variance would not be needed to meet the setback requirements for such a structure; and

10) if allowed, "we can expect other cell companies to place more towers in areas where setback requirements cannot be met. This would set a precedence whereby we could not discriminate against others. We would be inundated with unsightly towers."

Director Wilcox's letter also referred to attached OML information entitled "Local Officials Guide -- Siting Cellular Towers," and Director Wilcox informed the reader it "contains much more information." *Id.* at 26. In that document, in a bolded "Safety" section, it explains setbacks "establish safe zones for falling tower debris or collapse." *Id.* at 46. Other information contained with the OML sample ordinance states a setback "is intended to provide a safety area in case [of] tower failure or, more likely to occur, the area in which ice will fall from the tower." *Id.* at 67. It also explains "[a] setback of at least the height of the proposed tower is required when the site abuts a residentially zoned property or when the site abuts a street." *Id.* Clearly, the reasons for Director Wilcox's recommended denial, which the Board most certainly considered, do not appear to be based solely on collapse of the tower, and his letter did not recommend a blanket prohibition on towers within the City, but indicated co-location opportunities or alternative locations existed which would not require a variance.

The record does not contain a response from USCC to Director Wilcox's letter, but apparently some communication occurred to which Director Wilcox responded. On February 27, 2002, the Director sent another letter to USCC asking for clarification. *Id.* at 73. First, he noted the reason USCC gave for its inability to co-locate with the other communications company tower was that it was not within the engineering search ring, but Director Wilcox noted several

-19-

public land sites within the engineering search ring had elevations in excess of 900 feet above sea level and would not require a variance. *Id.* Director Wilcox also explained USCC had provided no documentation to support its claim it could not use existing water towers because they did not meet OSHA requirements or wind speed and ice specification requirements. *Id.* He also pointed out the City of Seminole was concerned the proposed tower would detract from the City's aesthetics. *Id.* Finally, he stated variances should only be granted when absolutely necessary and safe, and that a shorter tower could still fall to the center line of Eureka Street and kill or injure citizens and create liability for the City. *Id.* Nothing in the record shows USCC or Mr. Johnson specifically addressed or responded to Director Wilcox's questions or clarification requests.

At the next Board meeting, on February 19, 2002, the city attorney advised the ordinance was legal and had "no problem with existing ordinance[s]." *Id.* at 21. At that time, "US Cellular representatives then decided to change to a sectional tower," at which point discussion on the tower was continued. *Id.* However, USCC and Mr. Johnson never filed a new application or amended the monopole tower application to change their request to a variance for a sectional tower. Aplee. Br. at 6. On March 4, 2002, the manufacturer sent a letter to USCC concerning the sectional tower, stating "[w]hen steel becomes overstressed it does not suddenly break; it will bend and buckle. Therefore, *in the unlikely*

-20-

*event of failure, the tower would collapse within 50% of the overall tower height.*" Aplt. App. at 75 (emphasis added.)

On March 14, 2002, the Board met and denied a variance for the newly proposed 120-foot sectional tower on grounds it still did not meet setbacks required by the ordinance and "could fall to the center of Eureka Street and across the alley to the west. Also, the tower could fall over 50' of Bill's Garage." *Id.* at 23. In other words, when contemplating the possibility of a 50% collapse as indicated by the manufacturer, a 120-foot tower would bend over Bill's Garage, an occupied building. The Board minutes further stated, "[t]he locations are just not big enough to construct a 120' sectional tower, nor a 140' monopole tower." *Id.* at 23-24. The Board then denied a variance for the 120-foot sectional tower, after which it separately voted to deny a variance for a 140-foot monopole tower. *Id.* at 24.

While the Board meeting minutes and Mr. Wilcox's letters and attachments were not initially condensed into a more formal denial document, they adequately describe the reasons for denial sufficient for a court to evaluate whether substantial evidence in the record supported such denial. To insist on a more detailed description of the reasons for denial would place an undue burden on lay zoning boards. As explained by another court considering denial of a variance for a communications tower, "[l]ocal zoning boards are lay citizen boards, and while

their decisions must be in writing, the boards need not make extensive factual findings in support of their ultimate decision." *Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 629 (1st Cir. 2002). Stated another way, "council members . . . are not technocrats, and substantial evidence review does not require that the arguments and determinations be stated with exacting precision so long as the ultimate conclusion is undergirded by reasonable evidence." *United States Cellular Corp. v. City of Wichita Falls, Tex.*, 364 F.3d 250, 259 (5th Cir. 2004).

Nonetheless, following the district court's directions on remand, the Board issued a more formal written denial incorporating the facts, reasons and conclusions in support of its denial of the requested variance, which included reasons previously considered:

1) In the highly unlikely event of failure, the manufacturer expected the tower to collapse at the section points and within 50% of the overall tower height. Aplt. App. at 228.

2) Variance requests were 118 feet on the west property line, 76 feet on the east property line, and 49 feet on the south property line, as well as 110 feet from Bill's Garage and 20 feet from Movie Stars Video Rental. *Id.* The north portion beyond the property line was zoned R2 for two-family dwellings, and "[t]he proposed tower would be located 19.4' from the North property line . . . [and] 25'

from the East and West property lines." *Id.*

3) Pursuant to the local zoning code, variances are granted in individual cases of "unnecessary hardship," and USCC and Mr. Johnson provided no evidence a) of extraordinary or exceptional conditions related to the property's size, shape or topography; b) of creation of an unnecessary hardship as a result of any particular or exceptional situation or condition of the property; or c) that the variance could be granted without undermining the public safety and welfare. *Id.* at 228-32.

4) A 140-foot tower would require a setback of 168 feet on each side of the property, which is impossible on a tract of 50 feet by 50 feet, and the manufacturer's unimpressive evidence regarding the stability and strength of the proposed tower left the Board "unconvinced that the failure of the tower is an impossible occurrence." *Id.* at 230. The Board also found the safety area was "not so much to protect the public from towers failing, but to protect the public from ice which may form on and fall from the tower" and that "[t]his concern was raised several times during the discussions over this Application, but no solution was ever reached or suggested." *Id.* It also determined the setback or safe zone may be the best means to protect the public when a site abuts a residentially-zoned property or a street or alleyway. *Id.* at 230-31. It noted the tower would be just 30 feet from Bill's Garage and 90 feet from the center of Eureka Street,

meaning the public would be in close proximity to the tower on a regular basis. *Id.* at 231.

Because many of the reasons listed in the formal written denial document are identical or similar to those outlined in the Board's meeting minutes and Director Wilcox's February 14, 2002 letter and attachments, they do not establish an improper attempt by the Board to justify its decision on grounds different than those previously considered or otherwise equate to an impermissible *ad hoc* rationale. As to the ice issue, the referenced OML information recommended setbacks to address falling debris as well as ice and was sent to both the Board and USCC. The fact ice was not mentioned in the Board meeting minutes does not mean it was not of concern early on or not a reason, in part, for any Board member's denial. Furthermore, with respect to the tower collapse issue, in this case, the Board was not prohibiting any tower in the City, but merely disallowing placement of a tower in one specific location, based in part on a reasonable concern that if one-half of the tower collapsed due to a tornado or other reason, it might collapse on a regularly traversed street or an occupied building or near a residentially-zoned area. In addition, the record patently supports the determination USCC and Mr. Johnson provided no evidence of an unnecessary hardship with regard to the site location or, in other words, they provided no evidence showing why co-location on other existing towers or alternative sites

-24-

would not suffice.

The issue of *ad hoc* rationalization and other issues presented in this appeal are addressed in our decision in *United States Cellular Telephone of Greater Tulsa, L.L.C. v. City of Broken Arrow, Oklahoma*, 340 F.3d 1122 (10th Cir. 2003). While the record in that case was more comprehensive, its holdings suggest the Board did not: 1) impermissibly consider *ad hoc* factors; 2) have the burden with respect to issues of co-location, alternative locations, or undue hardship; 3) need to obtain expert evidence to support its denial of the variance; or 4) fail to rely on sufficient reasons for denial to meet the substantial evidence requirement. *Id.* at 1133-38.

To begin, in the *Broken Arrow* case, U.S. Cellular filed applications to construct cellular transmission towers, which went through the planning commission and then to the city council prior to denial. *Id.* at 1124-25. Regarding the first 120-foot monopole application, the city planning director, in his written recommendation in an agenda packet, determined in part, like here, that the tower location did not meet the minimum setback requirement (120% of the tower's height) and noted an alternative location existed for its placement. *Id.* at 1126. At the planning commission meeting, U.S. Cellular claimed alternative sites did not provide sufficient coverage, but, like here, did not provide evidence to substantiate its claim. *Id.* at 1127-28. The planning commission voted to deny

the request and forwarded a report to the mayor and city council nearly identical to the director's agenda packet recommendation. *Id.* at 1128 & n.11. At the city council hearing, members expressed concern regarding the monopole, adopted the planning commission's recommendation and then sent a letter to U.S. Cellular setting forth grounds for denial. *Id.* at 1128-29. This written decision, sent following the city council hearing, was intended to meet the provision in the local ordinance that denial of an application "shall be conveyed to the applicant in writing, together with the summary of the evidence which supports a denial of the application." *Id.* at 1124.

In a similar procedural situation, the planning commission recommended denial of another application by U.S. Cellular for a 240-foot tower. *Id.* at 1129-30. The director's agenda packet listed, in part, two reasons for denial, including the fact, like here, alternative sites existed close to the same location and it was undesirable to locate a 240-foot tower adjacent to single-family homes. *Id.* at 1129. In a recommendation almost identical to the director's agenda packet recommendation, the planning commission recommended denial to the mayor and city council, after which they denied the application and then sent a letter to U.S. Cellular listing the reasons for denial, including reasons addressed in the director's agenda packet. *Id.* at 1130-32 & n.18.

Our court found no *ad hoc* reasons for denial. *Id.* at 1134-35. In so doing,

-26-

we rejected U.S. Cellular's assertion the only reasons which could be considered were those discussed at the time of the city council's voice votes and not in its later written decisions. *Id.* at 1133-34. In so holding, we determined the written decisions were not *post hoc* determinations because:

1) the reasons set forth in the written decisions contained many of the same reasons in the agenda packet which the planning director created at the beginning of the application process and the planning commission considered before sending the city council its recommendation containing the same information in the agenda packet information. *Id.* at 1134-35;

2) the ordinance allowed a written decision after the vote to meet the self-imposed "in writing" requirement. *Id.* at 1135; and

3) it would be unfair to assume each city council member who voted to deny the application adopted only those reasons discussed at the hearing and, in any event, the written denials which set forth in writing the city's reasons for denial removed the need for such speculation. *Id.*

Arguably, similar circumstances exist in this case, so the reasons relied on by the Board are not impermissibly *ad hoc* in nature. We have a prior staff recommendation by Director Wilcox listing several reasons for denial, and even though the minutes only cursorily refer to some of those reasons, we should not assume any denial was based solely on the reasons listed in the minutes and not

his letter. In addition, akin to the *Broken Arrow* ordinance setting out its own method of compliance with the "in writing" requirement, Director Wilcox, in his initial letter, set out how the Board would meet the "in writing" requirement through the Board minutes and a copy of his written recommendation, to which USCC and Mr. Johnson did not object. Finally, on remand, the Board formally stated reasons for denial which included many of the reasons listed in the Board meeting minutes and the Director's recommendation, including references to the OML information and sample ordinance which mentioned safety problems with debris and ice.

As to "substantial evidence" supporting the denials, in *Broken Arrow* this court determined U.S. Cellular offered no evidence concerning the feasibility of co-locating on another tower. *Id.* at 1137. We stated, "[t]o the extent U.S. Cellular suggests that it was the City's burden to come forward with evidence concerning the feasibility of co-locating . . . we disagree. The Zoning Ordinance explicitly places this burden on the applicant." *Id.* We also said, "[w]e doubt that Congress intended local zoning boards to pay for experts to prove that there are alternative sites for a proposed tower," and "firmly" rejected the district court's statement "[t]he opinions expressed by . . . officials about the existence of other adequate existing locations amount to nothing more than 'generalized concerns' which are not adequate to fill the record with substantial evidence." *Id.* at 1137-

-28-

38. Finally, we determined the "substantial evidence" requirement does not encroach on local land use regulatory power, but instead "[t]he reviewing court's task is to determine whether the [local authority's] decision, *as guided by local law*, is supported by substantial evidence." *Id.* at 1133 (emphasis added, quotations marks and citation omitted). Stated another way, we "may not overturn the Board's decision on 'substantial evidence' grounds if that decision is authorized by applicable local regulations and supported by a reasonable amount of evidence." *MetroPCS, Inc., v. City & County of San Francisco*, 400 F.3d 715, 725 (9th Cir. 2005).

In this case, the local ordinance placed the burden on USCC and Mr. Johnson to explain why they could not co-locate on an existing tower, and the record does not show they satisfactorily responded to staff's questions or requests for clarification on co-location. In addition, with regard to alternative property site locations, nothing in the record shows USCC and Mr. Johnson established the existence of an unnecessary hardship as required by local law or otherwise sufficiently explained why alternative locations were insufficient. *See also Second Generation*, 313 F.3d at 628, 635 (holding in case with "unnecessary hardship" ordinance that communications company failed to show no other feasible sites existed, or that the land at issue was the only location where a tower could provide coverage to cover the gap area). Furthermore, under our own case

precedent, it clearly was not the Board's responsibility to get an expert opinion. *See Broken Arrow*, 340 F.3d at 1137-38.

In addition, even a cursory review of this and other circuit case law suggests many of the Board's listed reasons for denial, even when standing alone, are sufficient to meet the substantial evidence requirement, so long as the town or city did not impose a blanket prohibition on such towers. As one example, the Fifth Circuit, in *Wichita Falls*, looked at the City's reason for denial, based on the fact a 90-foot tower, like here, failed to significantly conform to the setbacks listed in its ordinance, noting:

> [The tower] would have required the City to reduce nearly every guideline listed in the ordinance. The proposed tower would have stood less than 62.8 feet from three of four property lines, less than 300 feet from the nearest residential use, and less than 300 feet from the boundary of the nearest residential zone. Furthermore, some of the reductions sought by U.S. Cellular would have been considerable; the tower would have stood *only 17.5 feet from one property line and only 25 feet from another.* Thus, the evidence before the City Council showed that the proposed tower seriously failed to conform to the setbacks listed in [the ordinance].

364 F.3d at 253, 257 (emphasis added). The court determined it need not reach the other reasons for denial as this reason alone constituted sufficient evidence for denial, and that the determination was not whether the denial was "unwise" but whether some reasonable evidence supported its conclusion. *Id.* at 259. Like the *Wichita Falls* case, the variance requested here is also extremely substantial in that "[t]he proposed tower would be located 19.4' from the North property line

-30-

. . . [and] 25' from the East and West property lines." Aplt. App. at 228. This, together with the various safety and other reasons considered by the Board, clearly demonstrates evidence "a reasonable mind might accept as adequate to support the conclusion reached." *Broken Arrow,* 340 F.3d at 1133 (quotation marks and citation omitted).

For these reasons, we conclude that the Board did not violate the TCA's procedural requirements when it denied Mr. Johnson's request for a variance from the City's setback requirements, and we therefore AFFIRM the judgment of the district court.

Entered for the Court
PER CURIAM