**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 17, 2008**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

T-MOBILE CENTRAL, LLC, as
successor in interest to
VOICESTREAM KANSAS CITY,
INC., doing business as T-Mobile,

      Plaintiff - Appellee,

v.

UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY, KANSAS
CITY, KANSAS,

      Defendant - Appellant,

------------------------

PCIA,

      Amicus Curiae.

No. 07-3332

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 06-CV-02313-DJW)**

---

Cathy J. Dean of Polsinelli, Shalton, Flanigan, Suelthaus, P.C., Kansas City,
Missouri, for Plaintiff - Appellee.

Patrick Waters of Unified Government of Wyandotte County/Kansas City Kansas
Legal Department, Kansas City, Kansas, for Defendant - Appellant.

Karl J. Nelson and Jennifer A. DeRose of Saul, Ewing, L.L.P, Baltimore,
Maryland, for Amicus Curiae.

Before **KELLY**, **BALDOCK**, and **O'BRIEN**, Circuit Judges.

**KELLY**, Circuit Judge.

T-Mobile, LLC, ("T-Mobile") brought this action challenging the decision of the Unified Government of Wyandotte County/Kansas City, Kansas ("Unified Government") to deny T-Mobile's application for a Special Use Permit to construct a wireless telecommunications facility. T-Mobile sought declaratory, injunctive, and mandamus relief. The parties filed cross-motions for summary judgment and the district court[1] granted T-Mobile's motion. In a memorandum and order, the court held that the Unified Government's denial of the application violated the Federal Telecommunications Act of 1996 "because the denial was not supported by substantial evidence and has the effect of prohibiting the provision of personal wireless services." T-Mobile Central, LLC v. Unified Government of Wyandotte County/Kansas City, Kansas, 528 F. Supp. 2d 1128, 1172 (D. Kan. 2007). The court entered its judgment declaring the above and granting injunctive relief by ordering the Unified Government to approve T-Mobile's application. The Unified Government now appeals. Our jurisdiction arises under 28 U.S.C. §§ 636(c)(3) and 1291, and we affirm solely on the basis that the Board's decision was not supported by substantial evidence. We do not reach the

---

[1] By consent of the parties, the action was heard before a magistrate judge. 28 U.S.C. § 636(c)(1).

issue of whether the decision had the effect of prohibiting the provision of personal wireless services.

## Background

### A.     The Permit Application Requirements

The Kansas City, Kansas, Code of Ordinances ("Code") establishes a permitting procedure whereby individuals or entities may seek to have the local governing body authorize, through the issuance of Special Use Permits, "certain uses and situations with characteristics which may not blend or harmonize with the uses in the standard zoning districts."  Kansas City, Kan., Code of Ordinances § 27-1251.  Section 27-1252 lists "[t]elecommunication antennas and towers" as such an "allowable special use."  Id. at § 27-1252.  Telecommunication antennas and towers which meet certain specified minimum criteria[2] "may be permitted

_____

[2] The relevant minimum criteria set forth in Section 27-1252 are as follows:

a.     All towers more than 100' tall shall be designed to accommodate at least three communication carriers.
b.     All towers shall be a distance from any off-site main residential structure at least equal to twice the height of the tower.
c.     Landscaping of tower as set out under 27-1349(a)(5).
d.     No tower shall be located within a distance of one-third of the height of the tower from any land without the landowner's written consent.
e.     No tower shall be located within a distance equal to the height of the tower from any off-site main residential structure.

Code § 27-1252(a)(32).  The parties do not contest that T-Mobile's proposal met
(continued...)

-3-

under special use permit in any zoning district except as specifically limited herein." Id. at § 27-1252(a).

The Code also establishes the considerations and factors which the governing body should take into consideration in granting Special Use Permits. Section 27-260 provides that the decisions and recommendations of the governing body should be based on the following general considerations: "(1) conformance with these regulations, the comprehensive plan, and other adopted plans, design guidelines and policies; (2) recommendations of staff and recommending bodies; (3) input of reviewing agencies and departments; (4) public comment and testimony received at the hearing; and (5) effects of the proposal on the neighborhood, area, and community-at-large." Id. at § 27-260(a). With regard to Special Use Permits in particular, Section 27-279 states that approval or denial of applications must be based on the following factors:

(a)     The character of the neighborhood.
(b)     Whether the proposed use will increase the amount of vehicular traffic to the point where it exceeds the capacity of the street network to accommodate it.
(c)     Where applicable, hours of operation.
(d)     Whether the proposed use is reasonably necessary for the convenience and welfare of the public and will not substantially or permanently injure the appropriate use, visual quality, or marketability of adjoining property.
(e)     Whether the noise, vibration, dust, or illumination that would normally be associated with such use is of such duration and

---

[2](...continued)
these minimum criteria.

intensity as to create problems for nearby property.

(f) Whether the proposed use would pollute the air, land or water.

(g) Compatibility with existing and proposed land uses in the surrounding area.

(h) Whether the use would damage or destroy an irreplaceable natural resource.

(i) The relative gain to the public health, safety, morals, and welfare as compared to the hardship imposed upon the individual landowner or landowners.

(j) The applicant's ability to maintain the use in an "as proposed" condition.

(k) Whether the proposed use would result in overcrowding of land or cause an undue concentration of population.

(l) In general, commercial and industrial Special Use Permits should not be granted adjacent to residential districts.

T-Mobile, 528 F. Supp. 2d at 1148-49 (citing Code §§ 27-279(f)(4)(b), 27-279(f)(5)).  Furthermore, the Code states that in evaluating applications for the siting of proposed telecommunication facilities, "commercial districts are generally preferred over those in residential districts as are sites in less restrictive residential or commercial districts generally preferred over those in more restrictive districts."  Code § 27-1252(a)(32)(h).

B.    T-Mobile's Special Use Permit Application

On December 9, 2005, T-Mobile filed an application for a Special Use Permit, requesting permission to build a 120-foot-tall telecommunications tower to provide adequate residential and vehicular cell phone coverage in the vicinity of the proposed site.  The application identified other structures (including a water tower and an existing monopole at a high school) within a mile of the site that could be used as alternatives to the proposed site, but rejected each of them

-5-

as inadequate. The application also included propagation studies showing existing coverage as well as anticipated coverage with the new tower.

The United Government Planning Department Staff ("Staff") advised rejecting the application. The Staff Report ("Report"), issued on March 13, 2006, considered numerous factors, several having particular relevance here. The Report noted, in considering the character of the neighborhood and the use of the property in question, that the neighborhood was "somewhat commercial in nature" and that the proposed site (which was zoned residential) was owned by and used as a church. The Report also considered the proposal's compatibility with and detrimental effect on nearby property, stating that the tower would be the "tallest structure in the area" and "may be considered unsightly by many." Furthermore, the Report, in considering whether the proposed use would be reasonably necessary for the welfare of the public, stated that the Staff doubted that there was a sufficient deficiency in cell phone performance to require a new tower.

Following the United Government Planning Commission's ("Commission") decision to postpone action on the application pending further information from T-Mobile, T-Mobile submitted new propagation maps and the results of a drive test. T-Mobile stated that the drive test confirmed the existence of a significant gap in cell phone coverage, and, therefore, the need for the proposed tower, while the Staff updated its report by stating that the test showed adequate service.

The application was then taken up for consideration by the Commission and

-6-

the Unified Government Board of Commissioners ("Board"). The Commission addressed the T-Mobile application on April 10, 2006. Following testimony by T-Mobile and the Planning Director, the Commission recommended rejecting the T-Mobile application. The Board then took up the application for final consideration on May 25, 2006, hearing more testimony from both T-Mobile and the Planning Director. The Planning Director testified that T-Mobile's drive test showed no dropped calls. In turn, T-Mobile explained that the drive test "was not a test of dropped calls in the area," but rather simply "confirmed in the field what our [propagation] maps already told us, that we had a hole in coverage in this particular area." T-Mobile introduced evidence from tests showing over 1,800 dropped calls in the vicinity during one week, and over 2,700 dropped calls during a different week. The Planning Director responded by stating that T-Mobile had 280 minutes of use per dropped call in the area, which he thought was "pretty good." In response, T-Mobile stressed that its dropped-call numbers fell below the industry average of 310 minutes of use per dropped call. At no time during the hearings did neighbors oppose the proposal on the basis of its aesthetics.

The Board denied the application, citing three primary reasons. First, the Board concluded that T-Mobile had failed to show that denial of the application would "prohibit the provision of personal wireless services." According to the Board, "[d]rive studies indicated that there were no dropped calls in the area

surveyed in stark contrast to studies submitted for other applications for cellular towers. Indicating zero or limited dropped calls seems to indicate this tower is not necessary for the convenience of the public." Second, the Board stated that the proposed 120-foot tower was not the "least intrusive means of fulfilling a gap, if any exists," in T-Mobile's services. The Board cited the Code's preference for commercial districts over residential districts, the indirectness of the relation between the proposed tower and the existing use as a church, and the aesthetic impact of the proposed tower. Third, the Board stated that the Commission had considered the Golden factors (factors that Kansas courts have recommended that cities review when deciding whether to grant special use permits) and had decided to reject T-Mobile's application.

## Discussion

We review the grant of a motion for summary judgment de novo, applying the same standard as the district court. Timmerman v. U.S. Bank, N.A., 483 F.3d 1106, 1112 (10th Cir. 2007). Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We examine "'the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party'." Antonio v. Sygma Network, 458 F.3d 1177, 1181 (10th Cir. 2006) (quoting Palladium Music, Inc. v. EatSleepMusic, Inc., 398 F.3d 1193,

-8-

1196 (10th Cir. 2005)).

A. Overview of Applicable Law

The Federal Telecommunications Act of 1996 ("TCA"), 47 U.S.C. § 332, limits the decision-making authority of local government bodies regarding the placement of wireless communications facilities. While Congress expressly preserved local zoning authority over the construction of personal wireless service facilities when it enacted the TCA, see U.S. Cellular Tel. of Greater Tulsa, LLC v. City of Broken Arrow, Okla., 340 F.3d 1122, 1132 (10th Cir. 2003), Congress adopted the TCA in order to promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies, City of Rancho Palos Verdes v. Abrams, 544 U.S. 113, 115 (2005). The TCA furthered these goals by reducing the impediments that local governments could impose to defeat or delay the installation of wireless communications facilities such as cell phone towers, id., and by protecting against "irrational or substanceless decisions by local authorities." Sw. Bell Mobile Sys., Inc. v. Todd, 244 F.3d 51, 57 (1st Cir. 2001).

To that end, Congress amended the Communications Act of 1934 by placing six restrictions on the authority of local governments in regulating the placement, construction, and modification of telecommunications facilities. 47 U.S.C. § 332(c)(7)(B)(i)-(v). Two of these provisions have potential relevance in this case. First, the TCA requires that any decision by a local government "to

deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii). Second, the TCA provides that local governments must not make decisions that "prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II). Because the Board's decision was not supported by substantial evidence, we need not reach the second of these provisions to conclude that the Board violated the TCA. See MetroPCS, Inc. v. City and County of San Francisco, 400 F.3d 715, 724 (9th Cir. 2005) ("If a zoning board's decision, reached under its own rules, is not supported by substantial evidence, then we need not consider the application of the anti-prohibition or anti-discrimination prongs of the statute.").

B.    The Board's Decision Is Not Supported by Substantial Evidence

Under 47 U.S.C. § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." Judicial review under the substantial evidence standard is "quite narrow." Broken Arrow, 340 F.3d at 1133; Ready Mixed Concrete Co. v. NLRB, 81 F.3d 1546, 1551 (10th Cir. 1996). While deferential, however, it is not a "rubber stamp." Broken Arrow, 340 F.3d at 1133 (quoting Sw. Bell Mobile Sys., 244 F.3d at 59). "'Substantial evidence is such

evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker].  Substantial evidence requires more than a scintilla but less than a preponderance.'"  Broken Arrow, 340 F.3d at 1133 (quoting Sandoval v. Aetna Life & Casualty Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)) (alteration in original).  "'The possibility of drawing two competing conclusions from the evidence does not prevent [a finding of] substantial evidence'."  Id. (quoting Curtis, Inc. v. I.C.C., 662 F.2d 680, 685 (10th Cir. 1981)). While a reviewing court has no power to substitute its own conclusions for those of the fact-finder, Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d 490, 494 (2d Cir. 1999), "if the record as a whole contains conflicting evidence, the fact-finder must adequately explain its reasons for rejecting or discrediting competent evidence," Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus, 197 F.3d 64, 71-72 (3d Cir. 1999).

Substantial evidence review does not create a substantive federal limitation on local land use regulatory power.  As the Ninth Circuit has stated, "the substantial evidence inquiry does not require incorporation of the substantive federal standards imposed by the TCA, but instead requires a determination whether the zoning decision at issue is supported by substantial evidence in the context of applicable *state and local law*."  MetroPCS, Inc., 400 F.3d at 723-24. (emphasis in the original).  Our substantial evidence review is "'directed to those rulings that the Board is expected to make under state law and local ordinance in

-11-

deciding on variances, special exceptions and the like.'" <u>Broken Arrow</u>, 340 F.3d

at 1133 (quoting <u>Sw. Bell Mobile Sys.</u>, 244 F.3d at 58).  Accordingly, this Court

must look to the requirements set forth in the local zoning code to determine the

substantive criteria to be applied in determining whether substantial evidence

existed to support the Board's decision.  <u>Id.</u>; <u>see also</u> <u>MetroPCS, Inc.</u>, 400 F.3d at

723-24; <u>U.S. Cellular Corp. v. City of Wichita Falls, Tex.</u>, 364 F.3d 250, 256 (5th

Cir. 2004).

Here, the Board's written decision offered three reasons for denying T-

Mobile's application.  The central issue is whether each of these reasons is

supported by substantial evidence in the record.

      1.     <u>Reason One: Failure to Show Prohibition of Personal Wireless Services</u>

           a.     <u>Absence of Support in Local Law for the "Failure to Show Prohibition of Personal Wireless Services" Criterion</u>

The first reason, set forth in Paragraph 1 of the written denial, that the

Board asserted to support its decision was that T-Mobile had "failed to show that

the denial of the Special Use Permit [would] prohibit the provision of personal

wireless services."  However, the Board erred in requiring T-Mobile to

demonstrate that denying the application would have the effect of prohibiting the

provision of wireless services.  No such criterion appeared in the Code at the time

of T-Mobile's application.  While the Code provided that approval or denial of

Special Use Permits should be based upon consideration of certain factors enumerated in Section 27-279(f)(5) and set forth specific minimum criteria for telecommunication facilities in Section 27-1252(a)(32), it did not require telecommunication providers to demonstrate prohibition of personal wireless services.

By inventing a criterion for which the applicable local ordinances did not provide, the Board failed to act on the basis of substantial evidence. "In order [to] be supported by substantial evidence, the proffered reasons must comport with the objective criteria in existence (i.e. zoning regulations, permit application policies, etc.). Governing bodies cannot simply arbitrarily invent new criteria in order to reject an application." Virginia Metronet, Inc. v. Bd. of Supervisors of James City County., Va., 984 F. Supp. 966, 974 n.14 (E.D. Va. 1998); see New Par v. City of Saginaw, 301 F.3d 390, 398 (6th Cir. 2002) (concluding that the zoning board's decision was not supported by substantial evidence because, among other reasons, the applicant's failure to show lack of alternatives did not "go to any of the criteria set out in the Zoning Code"); Town of Amherst, N.H. v. Omnipoint Commc'ns Enters., Inc., 173 F.3d 9, 14 (1st Cir. 1999) (stating that the substantial evidence standard "surely refers to the need for substantial evidence under the criteria laid down by the zoning law itself") (emphasis omitted); AT&T Wireless Servs. of Cal., LLC v. City of Carlsbad, 308 F. Supp. 2d 1148, 1163-64 (S.D. Cal. 2003). Indeed, we have clearly stated that we must "look to the

-13-

requirements set forth in the local zoning ordinance to ascertain the substantive criteria to be applied." Broken Arrow, 340 F.3d at 1133.  Although the TCA "does not divest local officials of any authority they may have to consider the quality of existing services, neither does it create such authority.  Efforts to assess existing quality . . . must be authorized by and performed within the parameters of governing state and local law." Ho-Ho-Kus, 197 F.3d at 70.  Because the Board had no basis in the local code for this criterion, the Board erred in its decision to require T-Mobile to demonstrate that the denial of the application would have the effect of prohibiting the provision of wireless services.

### b.      Zero or Limited Dropped Calls

However, the Unified Government did set forth one finding[3] under the "failure to show a prohibition of personal wireless services" heading that is justified under the applicable Code and should be examined under the substantial evidence test.

In Paragraph 1(a) of the written denial, the Board stated that the "[d]rive studies indicated that there were no dropped calls in the area surveyed in stark contrast to studies submitted for other applications for cellular towers.  Indicating

---

[3] The Board actually made three findings, all of which the district court rejected as unsupported by substantial evidence.  Because the Unified Government only appeals the district court's conclusion as to the first finding, we accept the district court's conclusion on the second and third findings as law of the case.  See Martinez v. Roscoe, 100 F.3d 121, 123 (10th Cir. 1996).

-14-

zero or limited dropped calls seems to indicate this tower is not necessary for the convenience of the public."[4] The Unified Government argues that this conclusion is supported by T-Mobile's statements in its application. First, as Paragraph 1(a) itself states, the Unified Government relies on the fact that the drive test showed no dropped calls. Second, the Unified Government argues that T-Mobile, by stating that its customers in the targeted area averaged nearly 280 minutes of use between dropped calls while its customers in the Kansas metro core as a whole averaged nearly 310 minutes of use between dropped calls, failed to show any prohibition of service in the targeted area. Moreover, the Unified Government contends that T-Mobile's evidence showing that there were over 1,800 and 2,700 dropped calls in two separate weeks is "unremarkable" and provides substantial evidence for denying the application.

However, the record does not show that the Unified Government had substantial evidence to support the conclusion that there were "zero or limited" dropped calls. The Unified Government erred to the extent that it relied upon the fact that the drive test did not show any dropped calls. The Unified Government, in asserting that the "drive studies indicated that there were no dropped calls in the area surveyed," apparently relied on the statements of the Planning Director at the May 25, 2006, Board meeting, when the Planning Director stated that the

---

[4] This reason appears to be based upon Section 27-279(f)(5)(d), and is therefore a valid criterion.

-15-

"drive test showed no dropped calls." However, as the record amply demonstrates and as the district court concluded, the drive test was not designed to measure dropped calls; rather, it was intended to measure the level of existing network coverage. As the drive test was not supposed to show the existence of dropped calls, the Board cannot rely upon it to show the absence of dropped calls. Therefore, because the Board's reliance on the drive test was based upon a misunderstanding of its purpose, the drive test cannot provide the substantial evidence necessary to support the Board's decision.

Because it was erroneous for the Board to rely upon the drive test, the Board had no substantial basis to determine that the amount of dropped calls T-Mobile customers experienced was actually acceptable. The only other evidence upon which the Board could rely to support its conclusion was the uncorroborated assertion of the Planning Director, who stated that, in his opinion, the dropped call data provided by T-Mobile indicated that T-Mobile's service in the targeted area was "pretty good." In opposition to this uncorroborated statement, T-Mobile submitted evidence stating that the number of dropped calls fell below the industry average. Accordingly, T-Mobile's evidence purporting to show significant numbers of dropped calls (which directly contravened the Board's conclusion) stands substantially uncontradicted.

While it is clear from this Court's decision in Broken Arrow that substantial evidence may exist to support a decision to refuse to issue a Special

-16-

Use Permit even if alternative conclusions could be drawn from the evidence, Broken Arrow, 340 F.3d at 1133, that situation is not presented here. Rather, the evidence available shows that the Board erroneously relied upon a drive test not intended to show dropped calls and upon the personal opinion of the Planning Director that the dropped call data was "pretty good." A determination regarding the quality of existing service must be based on substantial, competent evidence, Ho-Ho-Kus, 197 F.3d at 70, and that technical determination is not supported by substantial evidence where it is made solely on the adjudicator's unsubstantiated belief, see Primeco Pers. Commc'ns v. City of Mequon, 242 F. Supp. 2d 567, 578 (E.D. Wis. 2003), aff'd, 352 F.3d 1147 (7th Cir. 2003). As T-Mobile's arguments regarding the existence of dropped calls stands contradicted only by an unsubstantiated opinion, there is no substantial evidence to support the Board's finding.

2.      Reason Two: Not the Least Intrusive Means of Filling a Service Gap

a.      Absence of Support in Local Law for the "Least Intrusive Means" Criterion

The second reason, set forth in Paragraph 2 of the written denial, that the Board proffered for denying T-Mobile's application was that "[t]his particular 120 foot tower is not the least intrusive means of fulfilling a gap, if any exists, in the particular service provided by T-Mobile." Again, however, the Board erred in requiring T-Mobile to demonstrate that its proposal was the least intrusive means

-17-

of filling a service gap because nothing in local law permitted the Board to impose such a requirement. No such criterion appeared in the Code at the time of T-Mobile's application. Because the Board had no basis in the Code for this criterion, the Board erred in its decision to use the "least intrusive means" analysis as part of its decision-making process.[5] See Broken Arrow, 340 F.3d at 1133; New Par, 301 F.3d at 398; Omnipoint Commc'ns, 173 F.3d at 14; Virginia Metronet, 984 F. Supp. at 974 n.14.

The Unified Government's frequent references to Broken Arrow and U.S. Cellular Corp. v. Bd. of Adjustment of City of Seminole, Okla., 180 F. App'x 791 (10th Cir. 2006), are inapt. In Broken Arrow, we upheld a local board's decision to reject a tower application on the grounds that 1) the proposed site was zoned transitional, and 2) the cellular company had not demonstrated that no other tower could accommodate the proposed antenna. Broken Arrow, 340 F.3d at 1136-37. Similarly, in Seminole, we found that the local board's denial of a tower application was valid because 1) the proposal violated setback requirements, and

---

[5] The Unified Government erred as a matter of law by imposing a "least intrusive means" requirement as a prerequisite to issuance of a Special Use Permit. The TCA's substantial evidence standard does not require the incorporation of the TCA's substantive provisions against the *wireless provider*. Rather, the TCA's substantive provisions provide standards that the *local government* must meet. The Board could only apply the criteria set forth in the local zoning ordinance. To find otherwise would convert the TCA from a measure that reduces impediments to the installation of wireless communications facilities into a measure that imposes such impediments. Needless to say, that result would frustrate the central function of the statute.

2) the cellular company had not offered evidence regarding the feasibility of other sites.  Seminole, 180 F. App'x at 801, 803-04.  The Unified Government relies on Broken Arrow and Seminole to argue that the opinions of city officials regarding the feasibility of alternative sites are sufficient to constitute the substantial evidence required by the TCA.  However, in both Broken Arrow and Seminole the applicable zoning code required the applicant to prove that no existing structure could accommodate the proposed antenna.  See Broken Arrow, 340 F.3d at 1124; Seminole, 180 F. App'x at 803-04.  Here, in contrast, the Code did not require the applicant to prove that there was no other feasible alternative.  Therefore, the Unified Government's argument, based on these cases, that T-Mobile had to demonstrate that another site would be less intrusive is entirely irrelevant.

Nevertheless, the Unified Government sets forth several considerations under the "least intrusive means" heading that are justified under the applicable Code and should be examined under the substantial evidence test.

### b.    Preference for Commercial Districts

First, in Paragraph 2(a) of the written denial, the Board noted that Section 27-1252(32) of the Code created a preference for placing towers in commercial districts rather than residential districts.  The Code states, "In evaluating such proposed sites, commercial districts are generally preferred over those in residential districts as are sites in less restrictive residential or commercial districts generally preferred over those in more restrictive districts."  Code § 27-

-19-

1252(a)(32)(h).  The Unified Government argues that because the proposed site has a residential rather than commercial designation, the Board had substantial evidence to support its finding that the proposed tower was not the least intrusive means of filling a gap in service.[6]  However, T-Mobile argues that the Code's stated preference for commercial districts does not constitute substantial evidence because the Master Plan for the city designated the parcel as commercial and because the immediate vicinity included a church, a seminary, and an auto parts store, while there were only a few residential uses nearby.  Indeed, the Staff and the Commission recognized that the "neighborhood is somewhat commercial in nature" and that there are only a "few residential uses in the general area."  The district court concluded that the Board's failure to consider the actual use of the surrounding property meant that there was no substantial evidence supporting the Board's conclusion.  T-Mobile, 528 F. Supp. 2d at 1160.

The district court was correct in reaching this conclusion.  It is unreasonable for the Board to claim that the property's residential zoning constitutes substantial evidence without considering contrary factual evidence.

---

[6] The Unified Government relies on Broken Arrow, in which the local governing body denied the application because the local zoning ordinance stated that towers were "normally discouraged" in certain zoning districts, Broken Arrow, 340 F.3d at 1124-25, and the parcel was zoned transitional, id. at 1136.  In that case, however, the local ordinances required the cellular company to secure a conventional zoning change which the company had failed to secure.  Id.  No such requirement exists here.

"[T]he record should be viewed in its entirety, including evidence opposed" to the Board's view. Oyster Bay, 166 F.3d at 494; see Preferred Sites, LLC v. Troup County, 296 F.3d 1210, 1218 (11th Cir. 2002) ("[A] court should view the record in its entirety, including evidence unfavorable to the state or local government's decision."). If the record contains conflicting evidence, "the fact-finder must adequately explain its reasons for rejecting or discrediting competent evidence." Ho-Ho-Kus, 197 F.3d 64, 71-72; see Sprint Spectrum L.P. v. Bd. of Zoning Appeals of Town of Brookhaven, 244 F. Supp. 2d 108, 116 (E.D.N.Y. 2003) (finding that the rejection of a permit to construct a telecommunications tower was not supported by substantial evidence when the town failed to respond adequately to the contrary evidence provided by the telecommunications provider). Here, given that the Board considered the site's zoning designation in isolation without considering contrary factual evidence, the zoning designation cannot provide the substantial evidence necessary to uphold the Board's decision.

### c.    Compatibility with Existing Uses

Second, in Paragraph 2(b) of the written denial, the Board stated that it was denying the application because it was a "new additional use which has no direct relation with the current use of the property." The Unified Government correctly points out that the question on substantial evidence review is not whether the Court agrees with the Board's decision, but whether sufficient evidence supports the decision so that a reasonable mind could come to the same conclusion. See

-21-

Broken Arrow, 340 F.3d at 1133.  Here, however, the court is not simply disagreeing with the Board's decision; rather, there is insufficient evidence to support the decision.  The Unified Government argues that it was reasonable for the Board to conclude that the lack of any direct relation to the current use weighed in favor of denying the application.  But this asserted reason fails for the simple fact that the Code authorizes the Board to consider "compatibility" with existing uses, not the directness of the relation to existing uses.  Here, the Board only found that the uses were not directly related, not that the uses were incompatible.  This court does not quarrel with the Board's decision that the tower is not "directly related" to the current use as a church.  But on the evidence presented, there does not seem to be any legitimate argument that the church and the proposed tower were incompatible.  On the contrary, both parties agree that the income stream would benefit the church.  Therefore, there is no substantial evidence for finding the proposed tower to be incompatible with the existing use.

d.      Aesthetic Concerns

Third, the Board stated in Paragraph 2(c) of the written denial that it was denying the application because the proposed tower "is not aesthetically attractive in a residential neighborhood and would create blight in the view of the surrounding residential properties."  While aesthetics can be a valid ground for local zoning decisions Section 27-279(f)(5)(d), it is only a permissible ground for denial of a permit under the TCA if substantial evidence of the visual impact of

the tower is before the board. Mere generalized concerns regarding aesthetics are insufficient to constitute the substantial evidence justifying the denial of an application to construct a wireless telecommunications facility. Wichita Falls, 364 F.3d at 256; Preferred Sites, 296 F.3d at 1219; Sw. Bell Mobile Sys., 244 F.3d at 61; Oyster Bay, 166 F.3d at 495.

The Unified Government argues that its aesthetic concerns are supported by substantial evidence because the Board considered a photo simulation, the flatness of the terrain, and the presence of residential neighborhoods nearby. However, the Unified Government's conclusory reference to the flatness of the terrain and the presence of nearby residential neighborhoods is a classic example of generalized aesthetic concerns. No owners of nearby properties opposed the application or voiced their concerns with the tower's aesthetic impact. Accordingly, the only evidence in the record on which the Board could have based its aesthetic decision was the photo simulation of the proposed tower. This photo simulation, in the absence of concerns grounded in the specifics of this case (such as beautification efforts, neighbor complaints, the actual character of the immediate neighborhood, etc.) does not constitute substantial evidence for the purposes of the TCA. See PrimeCo Pers. Commc'ns v. City of Mequon, 352 F.3d 1147, 1150 (7th Cir. 2003) ("If blanket opposition to poles could count as sufficient evidence for denying an application to build an antenna, the substantial evidence provision of the Telecommunications Act would be set at naught.").

Accordingly, the Board's determination that the tower would be aesthetically unattractive is unsupported by substantial evidence in the written record.

3.      Reason Three: The Golden Factors

The final reason that the Board provided for rejecting T-Mobile's application was that it had "considered the 'Golden' factors set forth in the staff report and for the reasons stated herein denies" T-Mobile's application.  The Golden factors are a set of factors "suggested" by Kansas courts for use by municipalities during consideration of zoning changes or special use permits. Golden v. City of Overland Park, 584 P.2d 130, 135-37 (Kan. 1978).  The Golden factors include 1) the character of the neighborhood, 2) the zoning and uses of nearby properties, 3) the suitability of the property for the uses to which it is restricted, 4) the extent to which the change will detrimentally affect nearby property, 5) the length of time the property has been vacant as zoned, 6) the gain to the public health, safety, and welfare by the possible diminution of value in the developer's property as compared to the hardship imposed on the individual landowners, 7) recommendations of a permanent or professional planning staff, and 8) the conformance of the requested change to the city's master or comprehensive plan.  K-S Center Co. v. City of Kansas City, 712 P.2d 1186, 1195 (Kan. 1986) (citing Golden, 584 P.2d at 136).

The Staff Report, which was relied upon by the Board, referenced the following three Golden factors as evidence supporting the denial of the

application: the character of the neighborhood, the aesthetic impact of the proposed tower, and the dropped call data. Each of these factors have been adequately considered in the foregoing analysis. As outlined earlier, none of them are supported by substantial evidence. First, the nature of the neighborhood is largely commercial, and the Master Plan contemplates commercial use. Second, the generalized nature of the aesthetic concerns do not qualify as substantial evidence. Finally, the Unified Government's position with regard to the absence of dropped calls appears to flatly contradict existing evidence because the Unified Government could not point to substantial evidence in opposition to T-Mobile's testimony regarding the existence of dropped calls and the substandard nature of the existing service. Therefore, the Board's findings regarding the Golden factors are not supported by substantial evidence in the written record.

    AFFIRMED.