Justin MORRIS, as administrator to the Estate of George Morris, Plaintiff,

v.

Keith L. HUMPHREY, in his official and individual capacities as Chief of Norman Police Department, et al., Defendants.

No. CIV–14–497–W.

United States District Court, W.D. Oklahoma.

Signed Oct. 2, 2014.

Amber N. Garrett, David M. Garrett, Jr., Tulsa, OK, for Plaintiff.

Jeff H. Bryant, Kristina L. Bell, Rickey J. Knighton, II, City Attorney's, Norman, OK, Devan A. Pederson, Oklahoma City, OK, for Defendants.

## *ORDER*

LEE R. WEST, District Judge.

This matter comes before the Court on the Motion for Summary Judgment filed pursuant to Rule 56, F.R.Civ.P., by defendants Larry Shelton, Aaron Lancaster and Jonathon Hicks. Plaintiff Justin Morris, as administrator for the Estate of George Morris, has responded,[1] and the movants

---

1. In his response, Morris stated that he "believes that there are enough facts in dispute to preclude a granting of summary judgment because [the defendants have] ... failed to demonstrate that their evidence is beyond a reasonable doubt." Doc. 43 at 4. Morris further stated "that additional discovery needs to be performed in order to fully respond to the facts regarding the circumstances of the detention and death of G. Morris," *id.*, and he

requested that he "be permitted to depose defendant employees[.]" *Id.*

Morris did not however comply with Rule 56(d), F.R.Civ.P., which requires a nonmovant to "show[] by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition." *E.g., Wishneski v. Andrade,* 572 Fed.Appx. 563, 568–69 (10th Cir.2014)(cited pursuant to Tenth Cir. Rule 32.1)(Rule 56(d) specifies

have filed a reply. Based upon the record, the Court makes its determination.

Summary judgment should be granted "if the movant[s] show[ ] that there is no genuine dispute as to any material fact and [that they are] ... entitled to judgment as a matter of law." Rule 56(a), *supra.* At this stage of the litigation, the Court does not evaluate the credibility of the witnesses, *e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), or "weigh the evidence and determine the truth of the matter...." *Id.* at 249, 106 S.Ct. 2505. Rather, the Court must decide "whether there is a genuine issue for trial ... [and] there is no [triable] issue ... unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted). The Court's inquiry must be whether the evidence, when viewed "through the prism of the substantive evidentiary burden," *id.* at 254, 106 S.Ct. 2505, "presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52, 106 S.Ct. 2505. In making this determination, the Court must " 'examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving part[ies].' " *Pinkerton v. Colorado Department of Transportation,* 563 F.3d 1052, 1058 (10th Cir.2009)(quoting *T–Mobile Central, LLC v. Unified Government of Wyandotte County,* 546 F.3d 1299, 1306 (10th Cir.2008) (citations omitted)). That is to say, the Court must accept Morris' version of the events giving rise to this lawsuit, which relies almost exclusively on the Norman Police Department's ("NPD") Criminal Investigations Division Interview Summaries. *See* Docs. 14–1, 41–1, 41–2, 41–3.[2]

On December 16, 2012, at approximately 2:00 a.m., NPD received a 9–1–1 call regarding a naked white male standing in the southbound lanes of Interstate Highway 35 ("I–35"). Movants Lancaster, Hicks and Shelton, who are employed as NPD officers, responded to the request for "a welfare check." Doc. 41–1 at 5; *e.g.,* Doc. 41–2 at 4; Doc. 41–3 at 4.

The first to arrive was Shelton; he observed the individual, who was subsequently identified as Morris' sixty-six year-old father, George Morris ("G Morris"), jogging naked on I–35. Shelton drove his vehicle behind G Morris and yelled at him to stop. Shelton eventually exited his vehicle, announced he was an NPD officer and asked G Morris to sit on the curb. "[G] Morris resisted, yelled, [made] ... incoherent statements," Doc. 1–4 at 3, ¶ 15, and then ran across the southbound lanes of I–35 toward the median.

Lancaster was driving northbound on I–35 in response to the request for a "wel-

procedure, requiring motion with supporting affidavit, for litigants who seek to forestall summary judgment by claiming need for additional discovery; litigants who fail to properly avail themselves of procedure may not later challenge summary judgment on this basis); *Pasternak v. Lear Petroleum Exploration, Inc.,* 790 F.2d 828, 833 (10th Cir.1986)(protection afforded by Rule 56(f), now Rule 56(d), is *alternative* to or *in lieu* of response in opposition to motion for sum-

mary judgment); *id.* (mere assertion that discovery is incomplete not sufficient; opposing party must demonstrate how additional time would enable him to rebut movant's statement of undisputed facts).

2. Morris not only has not challenged the authenticity or accuracy of the events as recounted by the defendants, he has also quoted extensively from these summaries in his state court petition. *See* Doc. 1–4.

fare check," and he observed G Morris "waving his arms and . . . yelling," Doc. 41–1 at 5, at individuals, who were on the shoulder of the roadway. As Lancaster parked and exited his vehicle, he heard Shelton identify himself as police officer and yell at G Morris to "get out of the road." *Id.* Lancaster saw G Morris "run out into the interstate, and . . . into the center lane." *Id.* Both Shelton and Lancaster chased him and, again, after identifying themselves as police officers, shouted for G Morris to stop.

After seeing six or seven vehicles approaching in the northbound lanes, *e.g., id.;* Doc. 41–3 at 5, Lancaster decided to use his taser to prevent G Morris, who was "obviously agitated," *id.,* from jumping over the concrete barrier and into the northbound lanes. Lancaster yelled, "[T]aser, taser, taser," *id.,* " 'deployed his taser and made contact. . . .' " Doc. 1–4 at 4, ¶ 16 (citation omitted). The approximate time of the discharge was 02:05:04, and the firing lasted for five (5) seconds. *See id.* ¶ 19.[3]

Once the taser deployed, G Morris "locked up, and crumbled." Doc. 41–1 at 6. He fell to the ground and "curl[ed] up,' " Doc. 41–3 at 5, next to the barrier. He was yelling, "constantly repeating, 'Help me, help me,' " *id.,* and "the second the taser was over [G Morris] . . . rolled . . . on his back and sprawled out." Doc. 41–1 at 6. When asked by Shelton to identify himself, G Morris "said 'George, Juanita, Justin.' " Doc. 41–3 at 5.

Lancaster and Shelton "informed [G] Morris that they were there to assist him[and they] . . . attempted to get [him] . . . on his stomach to place him in hand restraints," Doc. 1–4 at 4, ¶ 17, but G Morris "just laid there [and] . . . moaned." Doc. 41–1 at 6. G Morris "stay[ed] calm," Doc. 41–3 at 5, but refused to cooperate and roll over onto his stomach. He began to get agitated again, and, according to Shelton, as Shelton began to turn G Morris over, "the fight was on." Doc. 41–3 at 5. G Morris was "struggling, turtl[ing] up, curl[ing] up." *id.,* as Shelton tried to pull his arm out.

During this time, co-defendant Jansen Idlett, a trooper employed by the Oklahoma Highway Patrol, arrived on the scene.[4] He heard Lancaster advise that he was going to fire his taser again and saw Lancaster do so. This discharge occurred at 02:07:33 and again lasted for five (5) seconds. *See* Doc. 1–4 at 4, ¶ 19. According to Lancaster, "the barb was actually not in him," Doc. 41–1 at 6; Lancaster "could see it on the ground, . . . near [G Morris'] . . . back . . . [and] arcing . . . ," *id.;* Lancaster nevertheless believed that it had "produced results [be]cause [G Morris] . . . stopped resisting and . . . laid there on his side while the taser cycled." *id.*

By this time, Hicks had arrived, and he had observed G Morris "throwing [Lancaster, Shelton and Idlett] . . . around like they were nothing. . . ." Doc. 41–2 at 7.

---

**3.** In his state court petition, Morris referred to "Captain Praizner's taser report." *See* Doc. 1–4 at 4, ¶ 19. Morris did not however submit this report for the Court's review. Rather, Morris relied on the NPD Criminal Investigations Division Investigative Report attached to the defendants' Motion to Dismiss, *see* Doc. 14–1, that was prepared by NDP Detective John C. Barbour on December 27, 2012. Barbour wrote that he had received an email from Captain Praizner docu-

menting the time and length of each firing of Lancaster's taser. *See id.* at 12.

**4.** In Idlett's vehicle were "a ride-along passenger and another detainee." Doc. 43 at 2. Morris has argued that the presence of these two individuals in Idlett's vehicle during the altercation demonstrates that Idlett perceived no threat to his safety.

According to Hicks, even after the second taser firing, G Morris was eventually "back to fighting with ... [the officers]," Doc. 41-2 at 4, saying, "Just shoot me, just shoot me." *Id.*

In Lancaster's opinion, the officers "weren't getting anywhere." Doc. 41-1 at 6, and "what [they] ... were doing wasn't working," *id.*, since there was "still [a] pretty good little fight," *id.*, going on. Because they had all moved closer to the inside lane of the interstate during the scuffle and because G Morris had not heeded their requests to cooperate and to stop resisting so he could be handcuffed, Lancaster decided to "dry[5] stun," *id.*, G Morris, and he placed the taser on G Morris' left shoulder. This firing occurred at 02:07:59 and lasted five (5) seconds, *see* Doc. 1-4 at 4, ¶ 19, but according to Shelton, "it wasn't effective [be]cause [G Morris] ... was still fighting." Doc. 41-3 at 5.

At this point, the defendants were able to roll G Morris on his stomach, even though he "start[ed] to fight again, and ... roll up on his side." *Id.* Idlett eventually was able to " 'secure[ ] [G Morris'] ...

right arm with a handcuff and ... Shelton secured ... [G Morris'] left arm....' " Doc. 1-4 at 3, ¶ 18 (quotation omitted). Because G Morris was still "kicking his legs," Doc. 41-3 at 5, Idlett retrieved leg restraints from his vehicle and secured G Morris' legs.[6]

According to the allegations in the complaint, after G Morris had been restrained, two individuals—Captain Eric Spor and a fireman, Taylor Hendrix,—"noted that [G] Morris was laying face-down, on the ground, with blood around his mouth and nose area." Doc. 1-4 at 5, ¶ 20. "When ... medic Valen Little arrived, [G] Morris [had] already ceased breathing and had a faint pulse." *Id.*[7] Attempts were made to resuscitate G Morris, but he died at 3:32 a.m. that same day. *See* Doc. 43-1 at 1.

The Report of Investigation and the Report of Autopsy prepared by the Office of the Chief Medical Examiner listed the manner of death as both "unknown," *id.*, and "undetermined," *id.* at 2, but identified the probable cause of death as "atherosclerotic cardiovascular disease and methamphetamine abuse," with "other sig-

---

5. Both in the removed state court petition and in Lancaster's interview summary, the phrase "dry stun method" is used. *See* Doc. 1-4 at 4, ¶ 18; Doc. 41-1 at 6. In the Motion for Summary Judgment, the defendants have used the term "drive-stun mode." Doc. 41 at 4, ¶ 6.

The Tenth Circuit uses the latter in describing a taser's "two functions[:] 'dart mode' and 'drive stun mode.' " *Estate of Booker v. Gomez*, 745 F.3d 405, 414 n. 10 (10th Cir.2014)(citing *Mattos v. Agarano*, 661 F.3d 433 (9th Cir.2011)(en banc)).

In dart mode, a taser shoots probes into a subject and overrides the central nervous system. In drive stun mode, "the operator removes the dart cartridge and pushes two electrode contacts located on the front of the taser directly against the victim. In this mode, the taser delivers an electric shock to the victim, but it does not cause an override of the victim's central nervous system...." *Id.* (quoting *Mattos*, 661 F.3d at 443). The Tenth Circuit has noted that "[d]rive stun

mode is used as 'a pain compliance tool with limited threat reduction.' " *Id.* (quoting *Abbott v. Sangamon County*, 705 F.3d 706, 726 (7th Cir.2013)(quotations omitted)); *e.g.*, *Roosevelt–Hennix v. Prickett*, 717 F.3d 751, 757 n. 9 (10th Cir.2013).

6. Although Morris' state court petition contained photographs of G Morris after his altercation with the defendants, the pictures are for the most part illegible, *see* Doc. 1-4 at 5, and in his response to the Motion for Summary Judgment, Morris did not include copies of the photographs for the Court's review.

7. Morris' allegations about Spor, Hendrix and Little are taken from the NPD Criminal Investigations Division Investigative Report prepared by Barbour, *see* Doc. 14-1, that was attached to the defendants' Motion to Dismiss. *See id.* at 5; *id.* at 10–11.

nificant medical conditions" as "exertion associated with electronic control device application." *Id.* In the comment section of the Report of Autopsy, it was noted that "[t]he combination of ... [significant] coronary artery disease, methamphetamine abuse, and exertion associated with the physical activity of the police interaction resulted in fatal cardiac ischemia." *Id.* at 3.

 Morris has sought relief against Shelton, Lancaster and Hicks under federal and state law, and in actions seeking relief under the former, and in particular, under title 42, section 1983 of the United States Code, the doctrine of qualified immunity—an affirmative defense on which the instant movants have relied—protects government officials from liability for civil damages unless a plaintiff " 'show[s]: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct.' " *Estate of Booker v. Gomez,* 745 F.3d 405, 411 (10th Cir.2014) (quoting *Cillo v. City of Greenwood Village,* 739 F.3d 451, 460 (10th Cir.2013))(further citation omitted). At the summary judgment stage, a plaintiff must "show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly estab-

lished at the time of the defendant's conduct." *Id.* (citation omitted).

 Morris' excessive force claim against these three defendants is " 'governed by the [f]ourth [a]mendment's "objective reasonableness" standard.' " [8] *Morris v. Noe,* 672 F.3d 1185, 1195 (10th Cir.2012)(quoting *Cavanaugh v. Woods Cross City,* 625 F.3d 661, 664 (10th Cir. 2010)). "Under this standard, 'the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.' " *Id.* (quoting *Graham v. Connor,* 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). A fourth amendment excessive force claim exists " '[i]f the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest[.]' " *Fisher v. City of Las Cruces,* 584 F.3d 888, 893–94 (10th Cir.2009) (quotation omitted).

In determining whether Morris has shown that a reasonable juror could find facts to support Morris' contention that Lancaster, Shelton and/or Hicks [9] violated G Morris' constitutional right to be free from an unreasonable seizure because they used excessive force, the Court must consider and balance three factors:

---

8. As the Court noted in an earlier Order, Morris had asserted that his excessive force claims against the three officers also arose under the fourteenth amendment to the United States Constitution. *See, e.g.,* Doc. 1–4 at 10, ¶ 44. The Court found in that Order that "because the [f]ourth [a]mendment protects against 'unreasonable searches and seizures' and pertains to the events leading up to and including an arrest of a citizen previously at liberty," *Porro v. Barnes,* 624 F.3d 1322, 1326 (10th Cir.2010), the fourteenth, and not the fourth, amendment governs in this case. *E.g., Austin v. Hamilton,* 945 F.2d 1155, 1160 (10th Cir.1991)(fourth amendment applies until formal charges are brought or arraignment

is held because force used is part of the "seizure"), *abrogated on other grounds. Johnson v. Jones,* 515 U.S. 304, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995).

9. Neither Morris nor the defendants analyzed the defendants' conduct individually because, as the record indicates, these three defendants "actively and jointly participated in the use of force, and ... even if a single [officer's] ... participation did not constitute excessive force, that [officer] ... could [arguably] be liable under a failure-to-intervene theory." *Gomez,* 745 F.3d at 422.

(1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether he [was] ... actively resisting arrest or attempting to flee.

*Morris,* 672 F.3d at 1195 (citing *Graham,* 490 U.S. at 396, 109 S.Ct. 1865).

■ It is undisputed that G Morris ran naked on I–35. Construing the record in Morris' favor, as the Court is required to do, the first *Graham* factor weighs against the defendants since although G Morris was exhibiting what the defendants have described in earlier submissions to the Court as "bizarre conduct," Doc. 14 at 8, and "highly erratic behavior," *id.* at 9, his behavior, as the defendants have conceded, was "not the most serious of criminal violations." *Id.* at 8. His conduct, however, was sufficiently serious to prompt a "welfare check" and to support the defendants' initial attempts to approach him.

With respect to the second *Graham* factor, the undisputed evidence permits the inference that G Morris posed a threat to the safety of the three movants, Idlett, himself and motorists on I–35, and it was reasonable for the defendants to attempt to contain G Morris' movements. The altercation occurred in the early hours of the morning; visibility was hampered, and there was traffic traveling at high rates of speed on the interstate. As they struggled, the defendants and G Morris moved away from the safety, if any, provided by the concrete barrier and the shoulder of the roadway and to the inside lane of I–35.

As it was later discovered, methamphetamine was present in Morris' blood, *see* Doc. 43–1 at 3; he was "obviously agitated," Doc. 41 –3 at 5, and his actions unpredictable. Accordingly, this factor weighs in favor of Shelton, Lancaster and Hicks.

■ As to the third *Graham* factor, Morris has conceded in his state court petition [10] that initially "Morris resisted, yelled, and [made] ... incoherent statements," Doc. 1–4 at 3, ¶ 15, and ran naked in the southbound lanes of I–35 toward the median; Morris has further conceded that even after Lancaster activated his taser the first time and the officers "attempted to get [G Morris] ... on his stomach to place him in hand restraints, ... [G Morris] ... proceeded to resist...." *Id.* at 4, ¶ 17.

■ "Under prevailing Tenth Circuit authority, 'it is excessive to use a [t]aser to control a target without having any reason to believe that a lesser amount of force ... could not exact compliance.'" *Gomez,* 745 F.3d at 424 (quoting *Casey v. City of Federal Heights,* 509 F.3d 1278, 1286 (10th Cir.2007)). And although Morris has alleged that G Morris had completely "stopped resisting the officer[s]," Doc. 1–4 at 4, ¶ 18, after the second firing, Morris has presented no evidence [11] that would support this assertion or that would raise a genuine issue of fact regarding the unreasonableness of the defendants' use of force [12] or Lancaster's decision to activate his taser a third time in light of the undis-

---

**10.** A statement in a legal pleading operates as a binding admission. *E.g., Rooms v. Securities and Exchange Commission,* 444 F.3d 1208, 1213 (10th Cir.2006)(pleading prepared by attorney is admission).

**11.** "[A]t the summary judgment stage ... [,] no longer can the plaintiff[ ] rest on facts as alleged in the pleadings." *Stonecipher v.*

*Valles,* 759 F.3d 1134, 1148 n. 9 (10th Cir. 2014) (citations omitted).

**12.** Morris has speculated that Idlett may have "stomped" on G Morris, *see* Doc. 43 at 2; the medical reports presented by Morris however make no reference to any injuries that would have been caused by, or be consistent with, stomping.

puted evidence that G Morris was "back to fighting with ... [the officers]." Doc 41–2 at 4.

██ Reasonableness under the fourth amendment is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (citation omitted), and as the Tenth Circuit has held, "[r]esistance satisfies the third *Graham* factor[:] ... a forceful takedown is objectively reasonable when a suspect struggles with police." *Huntley v. City of Owasso*, 497 Fed.Appx. 826, 831 (10th Cir.2012) (cited pursuant to Tenth Cir. R. 32.1) (citations omitted); *e.g., Cavanaugh*, 625 F.3d at 665 (use of taser unconstitutional only where jury could conclude victim did not pose immediate threat to officer or others and where victim not actively resisting).

Based upon the particular facts of this case, *e.g., Graham*, 490 U.S. at 396, 109 S.Ct. 1865, and acknowledging the tense and rapidly evolving situation presented that morning, the Court is constrained to find after consideration of a totality of the circumstances that a reasonable juror

could not conclude that a lesser degree of force would have exacted G Morris' compliance, and Morris has not suggested any alternative type of force that these three defendants should have employed.[13] Even though the Court must view the evidence in the light most favorable to Morris, the Court must accept, as the Tenth Circuit has directed, the defendants' version of events because nothing in the record contradicts their assertions.[14]

Lancaster, Shelton and Hicks have also sought summary judgment in their favor on Morris' claim that their conduct on December 16, 2012, violated article 2, section 30 of the Oklahoma Constitution.[15] In *Bosh v. Cherokee County Building Authority*, 305 P.3d 994 (Okla.2013), the Oklahoma Supreme Court recognized a private right of action under section 30 against law enforcement officials for excessive force,[16] notwithstanding the limitations of the Oklahoma Governmental Tort Claims Act, 51 O.S. ¶ 151 et seq.

Section 30 has been described as "Oklahoma[s] counterpart to the [f]ourth [a]mendment," *Bryson v. Oklahoma Coun-*

---

13. Having determined that the evidence taken in the light most favorable to Morris falls short of establishing a fourth amendment claim for excessive force, the Court need not address the second prong of the defendants' affirmative defense of qualified immunity.

14. Although these three defendants have addressed in the Motion for Summary Judgment their entitlement to summary adjudication of a section 1983 claim based upon denial of medical attention, the removed state court petition contains no section 1983 cause of action asserted directly against them. *See* Doc. 1–4 at 10 (Fourth Cause of Action/Excessive Force by Officer Shelton); *id.* at 11 (Fifth Cause of Action/Excessive Force by Officer Lancaster); *id.* at 12 (Sixth Cause of Action/Excessive Force by Officer Hicks).

The allegations regarding the denial of "prompt access to medical care" are found in the negligence-based causes of action asserted

against the City of Norman and the Oklahoma Highway Patrol, and section 1983 provides no relief for a defendant's negligent conduct.

15. Article 2, section 30 of the Oklahoma Constitution reads:

The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches or seizures shall not be violated; and no warrant shall issue but upon probable cause supported by oath or affirmation, describing as particularly as may be the place to be searched and the person or thing to be seized.

16. This cause of action may be maintained against the individual law enforcement officers who have allegedly used excessive force as well against as against their employers under a respondeat superior theory. *E.g., Bosh*, 305 P.3d at 1004.

*ty,* 261 P.3d 627, 638 (Okla.App.2011), and state courts, in evaluating excessive force claims under section 30, have adopted *Graham's* "reasonableness test." *E.g., id.* Because Morris has failed to show that a reasonable juror could find facts supporting a violation of a federal constitutional right, the Court concludes that no reasonable juror could find that a violation of a state constitutional right has occurred under these same facts and circumstances.

Accordingly, the Court

(1) GRANTS the Motion for Summary Judgment [Doc. 41] filed on August 26, 2014, by Shelton, Lancaster and Hicks; and

(2) ADVISES the parties that judgment pursuant to Rule 58, F.R.Civ.P., shall be entered once all claims have been resolved against all parties.